IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>LANCE CLAYTON PETERSEN<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:11-CR-0116<br><br>Judge Clark Waddoups |

## INTRODUCTION

Before the court is Defendant Lance Clayton Petersen's motion to suppress all evidence obtained from his truck on October 5, 2011 in North Salt Lake, Utah. (Dkt. No. 23.) Because the officers exceeded the scope of their investigatory stop and did not have probable cause to effectuate an arrest as explained herein, Mr. Petersen's motion is granted.

## FACTUAL BACKGROUND

On October 5, 2011, Officer Boyle received a dispatch call to the area of 100 South Main Street, North Salt Lake, stating that they had received a tip that a person had backed his vehicle up to an apartment complex under construction and gone inside the building where flashes of a flashlight could be seen. (Tr. 10) (Dkt. No. 34). According to Officer Boyle, the police "had a lot of problems in new construction [areas] . . . [with] wire thefts, scrap metal thefts, [and] thefts from construction sites." (Tr. 11-12.) Officer Boyle responded to the site around 1:30a.m. At that time, he and a few other officers began searching the building and heard that someone was still inside. (Tr. 11, 13, 48.)

1

After clearing the first area of the building, Officer Boyle was notified by Officer Barton that they had located an individual, Mr. Petersen, on the south end of the building, whom had been in the building. (Tr. 14-15.) Officer Barton had initially made contact with Mr. Petersen and asked him his name, to which Mr. Petersen responded truthfully. (Tr. 54, 59.) Officer Barton recognized the last name as matching the name on the registration of the suspect vehicle parked at the apartment building. (Tr. 54-55.) The officer further acknowledged that if he had doubts about the accuracy of the identifying information he could have verified it by accessing driver's license information available through the computer in his police car. (Tr. 59.) The officer apparently did not question the truthfulness of the information Mr. Petersen had presented. Officer Halls soon arrived and asked Mr. Petersen if he had been in the building. Mr. Petersen first denied, and then admitted that he had been inside. (Tr. 66.) During this conversation, Officer Halls told Mr. Petersen to stop putting his hands in his pockets. (Tr. 66.) After failing to do so, Officer Halls detained Mr. Petersen in handcuffs for the safety of all involved. (Tr. 66.) Officer Halls then frisked Mr. Petersen, but found nothing. While Mr. Petersen was still handcuffed, Officer Halls then took him to Officer Boyle's location closer to the truck.

Officer Boyle began questioning Mr. Petersen, asking him what he was doing in the area and why he had run off. (Tr. 15-17.) Mr. Petersen explained that he was looking for a house to live in and that he had just sold two houses. (Tr. 15-16.) Officer Boyle asked why he was looking at apartments, and Mr. Petersen explained that he wasn't able to purchase a home right away and was just looking for a place to live. (Tr. 17.) Officer Boyle asked why he had run off, but Mr. Petersen said that he did not run off. Officer Boyle then noted that it was the middle of the night and that Mr. Petersen could not have just walked away because Officer Boyle was

watching the only set of stairs leading out of the upper apartments. (Tr. 17.) Mr. Petersen at first didn't respond, but then acknowledged the video camera sign, suggesting that he had left the inside of the apartment building because he didn't want to get in trouble. (Tr. 17-18.)

During this conversation, Officer Barton canvassed the area to look for anything out of the ordinary, such as evidence of theft. (Tr. 56-67.) He found no evidence of criminal activity. (Tr. 56.) Officer Barton testified that when he was finished with the sweep, he then left. (Tr. 56.) Officer Barton also testified that the last time he saw Mr. Petersen, he was in handcuffs. (Tr. 60.) It was then that Officer Boyle asked for identification, which Mr. Petersen said was in the car. The government has provided no information about why Officer Boyle believed it necessary to see Mr. Petersen's identification at this point. None of the officers had questioned the accuracy of the identifying information Mr. Petersen had given them, particularly in light of the fact that the last name on the truck registration matched Mr. Petersen's name. Further, the officers had not attempted to verify the information through an on board computer.

Officer Boyle nevertheless asked for permission to get the identification, but Mr. Petersen resisted, stating it was his father's truck. (Tr. 90.) Officer Boyle then told Mr. Petersen that he could get a warrant or some dogs, to which Mr. Petersen responded "fine . . . do what you need to do." (Tr. 18, 91.) Believing this to be consent, Officer Boyle took the car keys from Mr. Petersen's pocket and then retrieved Mr. Petersen's driver's license from the truck. (Tr. 18.) While retrieving the license from the ash tray, Officer Boyle smelled the distinct odor of marijuana. (Tr. 19.) Officer Boyle then left the truck and asked permission to search it, but Mr. Petersen denied access. (Tr. 19.) Mr. Petersen then acknowledged that he had smoked marijuana and that there was a bowl between the seats. (Tr. 20.) At this point Mr. Petersen had already been arrested for trespassing. (Tr. 20.) The vehicle was then searched without a warrant,

3

and controlled substances, marijuana, pills, and a handgun were found. (Tr. 21.) Mr. Petersen was then indicted for being a convicted felon in possession of a firearm and for possessing marijuana.

## ANALYSIS

### I. THE INITIAL STOP AND DETAINMENT

The Supreme Court has stated that an officer can temporarily detain a suspect if the officer can point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 at 21; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("The police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable fact that criminal activity 'may be afoot,' even if the officer lacks probable cause."). This includes taking such steps that are "reasonably necessary to protect their personal safety and maintain the status quo during the course of [a *Terry*] stop." *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) (citations omitted); *see also, Lundstrom v. Romero*, 616 F.3d 1108, 1122 (10th Cir. 2010) ("Officers are authorized to handcuff individuals during the course of investigative detentions if doing so is reasonably necessary to protect their personal safety or maintain the status quo."); *United States v. Albert*, 579 F.3d 1188, 1193 (10th Cir. 2009) ("[T]he use of handcuffs is greater than a de minimus intrusion and thus requires the government to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that that the action taken was appropriate."). Furthermore, an officer may briefly detain an individual "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." *Oliver v. Woods*, 209 F.3d 1179, 1187 (10th Cir. 2000) (citing *Adams v. Williams*, 407 U.S. 143, 146 (1972)).

In any event, the Supreme Court has stated that "[i]t is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Royer*, 460 U.S. at 501. That said, such a detention must "last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Indeed, "[a]n encounter between police and an individual which goes beyond the limits of a *Terry* stop, however, may be constitutionally justified only by probable cause or consent." *Perdue*, 8 F.3d at 1462.

The government argues that the officers were justified in handcuffing Mr. Petersen for his and their own safety, and because he appeared to be "burglarizing, trespassing . . ., or committing a theft." (Dkt. No. 40, 16.) Indeed, Officer Hall placed Mr. Petersen in handcuffs after Mr. Petersen repeatedly placed his hands in his pockets even after being asked not to do so. (Tr. 66-67, 97-98.) Officer Hall also testified that the officers were working under the assumption that there may be another individual around the area. (Tr. 67.) Furthermore, the officers had reasonable suspicion to detain Mr. Petersen where he was in a high-crime area in the middle of the night, had already attempted to flee police, and then lied to them when questioned of his presence in the building. (Dkt. No. 40, 16.) *See United States v. McHugh*, 639 F.3d 1250 (10th Cir. 2011) (finding that suspicious activity in the early hours of the morning in an area of recent criminal activity were both factors in finding reasonable suspicion to detain an individual). Even if Mr. Petersen was truly looking for a place to live, his conduct was certainly suspicious. Therefore, because officers had reason to be concerned for their safety while they investigated whether any criminal activity had occurred, and absent any strong argument to the contrary by Mr. Petersen, the court finds that the actions taken to initially detain Mr. Petersen were appropriate.

## II. THE CONTINUED DETENTION OF MR. PETERSEN

### A. The Prolonged Handcuffing of Mr. Petersen Exceeded the Scope of the Detainment

Mr. Petersen first argues that the evidence should be suppressed because the police's authority to continue the detention ended when Mr. Petersen provided general information about who he was, where he lived, and what he was doing. (Dkt. No. 39, 12.) This contention is too broad. As previously stated, so long as there was a safety concern or there continued to be reasonable suspicion that Mr. Petersen was involved in criminal activity, the investigatory detention was proper. The more relevant question, however, is whether "the government has failed to articulate a basis to support the continued handcuffing and detention of Mr. Petersen once police completed the sweep of the building and found no evidence that he committed theft or 'any crime other than theft.'" (Dkt. No. 43, 4-5.) The evidence in the record supports this contention.

As previously explained, it was proper for Officer Halls to detain Mr. Petersen for the safety of all involved. (Tr. 66.) After Mr. Petersen was handcuffed, Officer Halls patted Mr. Petersen down and found nothing. (Tr. 67.) But rather than release Mr. Petersen, Officer Halls took him to Officer Boyle's location. (Tr. 67.) This is also sensible in light of the fact that the investigation was still continuing and that the officers were still trying to ascertain whether there were other individuals in the building. (Tr. 67.) Based upon the record, however, the evidence is ambiguous as to when the investigatory period ended. What appears to be certain is that the investigation ended no later than Officer Barton's brief canvas of the area. (Tr. 56.) By this point, it was clear that Mr. Petersen did not have any weapons on his person, and that the apartment building had been cleared. Even so, Mr. Petersen remained handcuffed. (Tr. 60.) It may be that Officer Boyle assumed that Mr. Petersen had originally been arrested for trespassing

and was therefore not looking to end the investigative stop. If so, Officer Boyle may have incidentally detained Mr. Petersen longer than necessary to carry out the purpose of the detention. (Tr. 20.)

Regardless of what actually occurred, the court concludes that the government has not presented evidence that supports a theory that the investigative stop had terminated, as it should have, by the time that Officer Boyle asked Mr. Petersen for his consent to search the truck. Indeed, this court has previously found detention continuing under facts much less clear than in this case, and where handcuffs were not involved. *See United States v. Conte*, No. 2:10-cr-767, 2012 U.S. Dist. LEXIS 16470 at *14 (D. Utah February 8, 2010) (finding that although an officer returned an individual's driving documents, the detention had not ended when the officer never informed the individual the outcome of the stop, did not give a citation or warning, did not indicate he was free to go, and did not otherwise disengage from the communication); *see also United States v. Pena-Montes*, 589 F.3d 1048, 1057 (10th Cir. 2009) (stating that the government bears the burden of demonstrating that a stop is reasonable). Although the court does not believe that Mr. Petersen's continued detention was malicious, it was nevertheless unnecessary and exceeded the scope of the initial detention.

### B. There Was No Probable Cause for Arrest

The seizure of the evidence could possibly survive if Mr. Petersen's initial detainment resulted into an arrest with probable cause. *See Perdue*, 8 F.3d at 1462 ("An encounter between police and an individual which goes beyond the limits of a *Terry* stop, however, may be constitutionally justified only by probable cause or consent."). The court begins with analyzing whether the officers had probable cause for arresting Mr. Petersen for criminal trespass, as stated by Officer Boyle. (Tr. 20.) The elements of criminal trespass include:

(2) A person is guilty of criminal trespass if . . .

7

> (b) knowing the person's entry or presence is unlawful, the person enters or remains on property as to which notice against entering is given by:
> (i) personal communication to the actor by the owner or someone with apparent authority to act for the owner;
> (ii) fencing or other enclosure obviously designed to exclude intruders; or
> (iii) posting of signs reasonably likely to come to the attention of intruders

*Utah Code Ann.* § 76-6-206.[1]

The evidence may be sufficient to support an inference that Mr. Petersen believed his entry or presence on the property was unlawful given the fact that he first lied and then subsequently admitted to the police that he left the building because he "didn't want to get in trouble." (Tr. 18.) Furthermore, Mr. Petersen acknowledged a surveillance sign as being his cause of concern. (Tr. 18.) The sign itself states:

> WARNING
> ALL ACTIVITIES ARE
> RECORDED TO AID IN THE
> PROSECUTION OF ANY
> CRIME COMMITTED
> AGAINST THIS FACILITY

(Def.'s Ex. K, Mot. Hearing April 18, 2012).

The knowing element of § 76-6-206(b) would therefore be met if Mr. Petersen's entry onto the property was, indeed, unlawful. Despite Mr. Petersen's own belief at the time of the incident, however, the sign did not give "notice against entering" as required to find a violation under § 76-6-206(2)(b)(iii). In fact, Officer Boyle told Mr. Petersen that the sign did not say anything about trespassing but only indicated that it could be used to prosecute people, if necessary. (Tr. 44.) Therefore, there was no probable cause to arrest Mr. Petersen under § 76-6-206(2)(b)(iii).

---

[1] Subsections (a) and (b) include alternative elements for criminal trespass. *See Utah Code Ann.* § 76-6-206 3(c). There is no evidence that subsection (a) applies.

8

The government also argues that Mr. Petersen violated § 76-6-206(b)(ii) because he knowingly entered into the apartment complex during a phase of construction when the doors were being hung. (Dkt. No. 40, 15.) The government contends that some of these doors were locked, which put Mr. Petersen on notice that the building was not open to the general public. (Dkt. No. 40, 15.) Contrary to the government's argument, nothing in the statute suggests that locked doors may serve as a proxy for a sign giving notice against entering. Moreover, there is no evidence to support a belief by the police that Mr. Petersen had entered any apartment with a locked door. There was no indication that any door had been forced or a door-jam broken. Further, there is no evidence that Mr. Petersen passed through doors that could reasonably constitute "fencing or other enclosure obviously designed to exclude intruders." Accordingly, this contention is also rejected.[2]

## **CONCLUSION**

Because the evidence fails to demonstrate that the purpose for detaining Mr. Petersen had not yet been completed by the time any consent may have been given, and because the officers did not have probable cause to place him under arrest, the continued detainment of Mr. Petersen was improper and violated his Fourth Amendment rights. Accordingly, the court finds that even if Mr. Petersen's consent was given to search his truck for the purpose of retrieving his license, it

---

[2] Inasmuch as the government may argue that there was also probable cause to arrest Mr. Petersen for burglary, the contention is likewise rejected. (Dkt. No. 40, 12.) The relevant Utah statute states:
> (1) An actor is guilty of burglary who enters or remains unlawfully in a building or any portion of a building with intent to commit:
>     (a) a felony;
>     …
>     (b) theft;

*Utah Code Ann.* § 76-6-202

As previously discussed, there was no communication, sign, or enclosure prohibiting Mr. Petersen from entering the building. The government thus failed to show that Mr. Petersen entered the building unlawfully. Accordingly, this argument is likewise rejected.

was "tainted by the illegality." *Royer*, 460 at 508.[3] Mr. Petersen's motion to suppress all evidence discovered incident to the search of Mr. Petersen's automobile on October 5, 2011 is GRANTED. (Dkt. No. 23.)

DATED this 22nd day of May, 2012.

BY THE COURT:

_____
Clark Waddoups
United States District Judge

---

[3] Because the court is ruling on the basis that Mr. Petersen's detention was excessive, the parties' arguments relating to whether Mr. Petersen freely and voluntarily consented to the initial search for his license, whether a warrantless search was justified after Officer Boyle smelled the odor of marijuana, and whether the police would have found the evidence during an inventory of car, are all mooted.